**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SILEIRI DOE, on behalf of herself and all others similarly situated, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY et al., <br><br> *Defendants*. | Case No. 1:25-cv-12245 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF MATERIAL FACTS.................................................................................... 2

I.      Statutory and Regulatory Background ................................................................... 2

II.     Factual Background.................................................................................................... 3

        A.      Plaintiffs secured appointments using CBP One, presented themselves at
                designated POEs, and were lawfully granted parole..................................... 3

        B.      Defendants terminated Plaintiffs' parole without explanation.................... 6

        C.      Plaintiffs have suffered serious harm.......................................................... 9

III.    Procedural History ................................................................................................... 10

LEGAL STANDARD ................................................................................................................. 11

ARGUMENT............................................................................................................................... 11

I.      Defendants' Decision to Terminate Parole *En Masse* Is Arbitrary, Capricious, and
        Contrary to Law ...................................................................................................... 12

        A.      Defendants' abject failure to explain their decision to terminate parole *en
                masse* is arbitrary and capricious .............................................................. 12

        B.      Defendants' decision to terminate parole *en masse* violates the INA ........ 17

        C.      Defendants' decision to terminate parole *en masse* violates DHS regulations ........... 18

II.     The Parole Terminations Themselves Are Arbitrary, Capricious, and Contrary to
        Law .......................................................................................................................... 20

CONCLUSION............................................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822 (D. Md. 2025) ........................ 14

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281 (1974) ................................... 13

*Bridgeport Hosp. v. Becerra*,  108 F.4th 882 (D.C. Cir. 2024) ................................................................. 20

*Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338 (1st Cir. 2004) ................................... 13

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ..................................................................................... 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ........................................ 16

*Doe v. Noem*, No. 25-1384, 2025 WL 2630395 (1st Cir. Sept. 12, 2025) ............................... 14, 17, 18

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ................................................................ 13, 16

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................................................. 12, 13, 15, 16

*Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*, 75 F.4th 248
   (1st Cir. 2023) ..................................................................................................................................... 13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................................................... 11

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ......................................................................................... 13

*Minuteman Health, Inc. v. United States Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174
   (D. Mass. 2018) ................................................................................................................................... 11

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................................... 13, 15, 17

*Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999 (D.C. Cir. 2014) ........................... 19

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018)............ 19

*RFE/RL, Inc. v. Lake*, 772 F. Supp. 3d 79 (D.D.C. 2025) .................................................................. 14

*S.A. v. Trump*, 363 F. Supp. 3d 1048 (N.D. Cal. 2018)....................................................................... 16

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ........................................................................................... 13

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497 (2025) ................................... 11

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ................................... 20

*Y-Z-L-H v. Bostock*, No. 3:25-CV-965-SI, 2025 WL 1898025 (D. Or. July 9, 2025) .......................... 17

**Statutes**

5 U.S.C. § 706 ............................................................................................... 11, 12

8 U.S.C. § 1182................................................................. 2, 6, 12, 15, 17, 18

**Other Authorities**

Ali Bianco, *DHS Revokes Parole for Hundreds of Thousands Who Entered Via the CBP One App*, Politico, (Apr. 8, 2025), https://perma.cc/M7FE-7DQJ ........................................................ 6, 14

Dep't of Homeland Sec., Six Months of Keeping America Safe Under President Trump and Secretary Noem (July 20, 2025), https://perma.cc/7Z6X-328H..................................................... 3

Examining CBP One:  Functions, Features, Expansion, and Risks: Joint Hearing Before the Subcommittee on Border Secretary and Enforcement and the Subcommittee on Oversight, Investigations, and Accountability, 188th Cong. at 20 (Mar. 21, 2024), https://perma.cc/A8RD-5SHS..................................................................................... 6

Fact Sheet: Using CBP One™ to Schedule an Appointment, CBP One:  Policies, Guides, Training, Memos (Sept. 26, 2024) at 2 (Sept. 26, 2024), https://perma.cc/XGP9-G5AP ............................ 3

Michael Rosenfield, *DHS told her to leave the country. She's a citizen—and an immigration attorney*, NBC Boston (Apr. 13, 2025), https://perma.cc/F2LR-SV5L ...................................................... 15

Staff Reports, *2nd Mass. immigration attorney, also US citizen, told to leave country in DHS email*, NBC Boston (Apr. 15, 2025), https://perma.cc/X3HK-WNA4 ................................................. 15

**Regulations**

8 C.F.R. § 212.5.................................................................... 2, 6, 12, 19, 20

Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) ..................................... 2, 3

Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611 (Mar. 25, 2025). ..................................................................................... 18

**INTRODUCTION**

Over the span of a few weeks, Defendants U.S. Department of Homeland Security (DHS) and U.S. Customs and Border Protection (CBP) abruptly and arbitrarily stripped away the legal right to live and work in the United States for roughly 900,000 noncitizens who had been lawfully permitted to enter and remain in the country for up to two years.  Defendants did not provide any explanation.  They did not consider any individual person, their circumstances, or their humanitarian need to temporarily reside in the United States.  They did not explain why they reversed course from their earlier position that the same individuals met the criteria for parole.  Instead, Defendants appeared to target individuals who secured their appointments for inspection at the U.S.-Mexico border by using DHS's (now defunct) "CBP One" mobile application, and instructed the individuals to "depart the United States *immediately*" or else they "will be subject to potential law enforcement actions that will result in [their] removal from the United States."  In some cases, Defendants terminated an individual's parole without any communication.

Plaintiffs went from living in the United States legally to being deemed "illegal aliens" overnight, substantially increasing their risk of immediate detention and removal to countries from which they fled (or even to third countries to which they have no ties).  Defendants also terminated Plaintiffs' work authorization, which depended on their parole status, thereby threatening Plaintiffs' primary source of income.  And Defendants' actions jeopardized Plaintiffs' ability to apply for or continue to pursue asylum or other permanent immigration relief.

Defendants' decision to terminate parole *en masse* and the terminations themselves are patently unlawful.  They violate the basic tenets of the Administrative Procedure Act (APA), which requires that agencies make reasonable decisions and provide adequate explanations for those decisions, and that agency decisions do not violate the law.  But Defendants' mass parole terminations lack any explanation justifying their decision, and they violate both the Immigration and Nationality Act (INA) and DHS regulations.

Individual Plaintiffs, on behalf of themselves and others similarly situated, and Venezuelan Association of Massachusetts ("VAM") on behalf of its members, ("Plaintiffs") therefore respectfully

1

move for summary judgment on their claims that Defendants DHS and CBP violated the APA when they terminated *en masse* humanitarian parole for noncitizens who secured their appointments for inspection at the U.S.-Mexico border using CBP One and were permitted to lawfully enter the United States between May 16, 2023, and January 19, 2025.

STATEMENT OF MATERIAL FACTS

## I.   Statutory and Regulatory Background

The Executive Branch has long been permitted to exercise its discretion to temporarily allow into the United States noncitizens who are applying for admission to the country. *See* 8 U.S.C. § 1182(d)(5)(A).  Currently, the DHS Secretary holds that parole authority by statute, which reads:

> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States.

*Id.*

DHS regulations, in turn, provide the conditions under which the Secretary or her designees may grant and terminate parole.  8 C.F.R. § 212.5.  Specifically, the regulations provide that parole may be granted "in accordance with" section 212(d)(5)(A) of the INA "after review of the individual case."  *Id.* at § 212.5(c).  A grant of parole terminates automatically, without written notice, when (1) the noncitizen departs the United States, or (2) "if not departed, at the expiration of the time for which parole was authorized."  *Id.* at § 212.5(e)(1).  In all other cases, parole "shall be terminated upon written notice to the alien."  *Id.* § 212.5(e)(2).  Those other cases include when the "purpose for which parole was authorized" is "accomplish[ed]" or "when in the opinion of" the DHS Secretary or an authorized official "neither humanitarian reasons nor the public benefit warrants the continued presence of the alien in the United States."  *Id.*

Relevant here, in May 2023, DHS regulations directed noncitizens to use the CBP One app as the primary, if not exclusive, mechanism to present themselves to seek parole and/or asylum at the U.S.-Mexico border.  *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314, 31,317-18 (May 16, 2023).  DHS's regulations required that noncitizens at the border use the CBP One app to schedule

an appointment for inspection at a port of entry ("POE"), or else they were ineligible for asylum, with very limited exceptions. *Id.* CBP One was not a tool to request parole or to claim asylum, but a scheduling tool to make appointments for inspection at a designated port of entry. *See* Fact Sheet: Using CBP One™ to Schedule an Appointment, CBP One: Policies, Guides, Training, Memos (Sept. 26, 2024) at 2 (Sept. 26, 2024), https://perma.cc/XGP9-G5AP ("This scheduling function will allow noncitizens to schedule a time and place to seek an exception from Title 42 public health order for humanitarian reasons based on self-certification of a vulnerability at a port of entry."). CBP officers at the border retained discretion to determine the appropriate process for each noncitizen, including an option to grant parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *Id.* ("The granting of an appointment does not guarantee an exception from the Title 42 order. CBP will make determinations of whether an exception is authorized at the POE.").[1]

## II. Factual Background

### A. Plaintiffs secured appointments using CBP One, presented themselves at designated POEs, and were lawfully granted parole

Individual Plaintiffs Sileiri Doe, Meryem Doe, and Olivia Doe, and members of Plaintiff VAM secured appointments for inspection at the U.S.-Mexico border using CBP One and were permitted to lawfully enter the United States between May 16, 2023, and January 19, 2025. Sileiri Decl. ¶ 3, ECF No. 32-4; Olivia Decl. ¶¶ 3,5, ECF No. 32-5; Meryem Decl. ¶ 3, ECF No. 32-6; Velasquez Decl. ¶¶ 9,11-13, ECF No. 32-7.

**Sileiri Doe** is a native and citizen of Venezuela, and fled Venezuela based on her fear that the government will harm or kill her for having protested the poor conditions and lack of resources in Venezuelan hospitals. Sileiri Decl. ¶¶ 1, 9. Sileiri was kidnapped and tortured by the Venezuelan government while pregnant. *Id.* ¶ 9. After inspection on September 14, 2024, Sileiri was granted parole for urgent humanitarian reasons or significant public benefit and was provided an I-94 (proof

---

[1] On January 20, 2025, Defendants canceled all pending CBP One appointments and disabled the application's scheduling functionality; in March, Defendants renamed the app "CBP Home" and enabled it so that noncitizens could report their departures via the app. *See* Dep't of Homeland Sec., Six Months of Keeping America Safe Under President Trump and Secretary Noem (July 20, 2025), https://perma.cc/7Z6X-328H.

of legal visitor status) allowing her to stay in the United States until September 13, 2026. *Id.* ¶ 3. Sileiri also received work authorization that permitted her to work lawfully in the United States until September 13, 2026. *Id.* Sileiri's parole was terminated on April 18, 2025, and her work authorization was revoked around the same time. *Id.* ¶ 16. Sileiri timely filed an application for asylum. *Id.* ¶ 13. The next hearing in Sileiri's asylum case is scheduled for September 22, 2026. *Id.*

**Olivia Doe** is a native and citizen of Haiti, and fled Haiti after being threatened and harassed by members of a gang. Olivia Decl. ¶¶ 1, 10. After inspection on December 1, 2024, Olivia was granted parole for urgent humanitarian reasons or significant public benefit and was provided an I-94 allowing her to be lawfully present in the United States through November 30, 2026. *Id.* ¶¶ 3, 5. Olivia's parole was terminated on April 18, 2025. *Id.* ¶ 14. Olivia timely filed an application for asylum and has a court date on December 8, 2027. *Id.* ¶¶ 12, 14.

**Meryem Doe** is a native and citizen of Cuba, and fled Cuba after being harassed for her alleged political opinion. Meryem Decl. ¶¶ 1, 11. Meryem was wrongly accused of helping a colleague flee to Mexico and was told that to rehabilitate herself she had to declare herself a member of the Communist Party. *Id.* ¶ 12. When she refused, she was reported to the Communist Party; the government and the Communist Party began to investigate her, threatened her husband's business, and extorted them. *Id.* After inspection on July 14, 2024, Meryem was granted parole for urgent humanitarian reasons or significant public benefit and was provided an I-94 allowing her to be lawfully present in the United States through July 13, 2026. *Id.* ¶ 3. Meryem also received work authorization that permitted her to work lawfully in the United States until July 13, 2026. *Id.* Meryem's parole was terminated on April 18, 2025, and her work authorization was revoked around the same time. *Id.* ¶¶ 21, 23. Meryem timely filed for relief under the Cuban Adjustment Act. *Id.* ¶ 4.

**VAM Member A** is a native and citizen of Venezuela, and fled Venezuela after being abused, mistreated, and threatened for her political opposition to Hugo Chavez and the narco-dictatorship in Venezuela. Velasquez Decl. ¶ 11. After inspection on July 24, 2024, VAM Member A was granted parole for urgent humanitarian reasons or significant public benefit and was provided an I-94 allowing her to be lawfully present in the United States through July 23, 2026. *Id.* VAM Member A's parole

4

was terminated on or about April 6, 2025. *Id.* She timely filed an application for asylum on June 18, 2025, and has an upcoming hearing in immigration court on November 6, 2025. *Id.*

**VAM Member B** is a dual citizen of Venezuela and Colombia. *Id.* at ¶ 12. He was specifically targeted in Venezuela because he is against the regime in power. *Id.* He fled Venezuela after his partner was kidnapped and he was threatened with death; he went to Colombia, where he was nearly killed on account of his sexual orientation. *Id.* After inspection on November 17, 2024, VAM Member B was granted parole for urgent humanitarian reasons or significant public benefit and was provided an I-94 allowing him to be lawfully present in the United States through November 16, 2026. *Id.* VAM Member B's parole was terminated on or about April 18, 2025. *Id.* He timely filed an application for asylum on May 6, 2025. *Id.* He has an upcoming hearing in immigration court scheduled for April 21, 2027. *Id.*

**VAM Member C** is a citizen of Venezuela who fled Venezuela with his wife, **VAM Member D**, another citizen of Venezuela, and their young daughter because they are against the government in power and were targeted because of their political opposition. *Id.* ¶ 13. After inspection on December 2, 2024, VAM Members C and D were granted parole for urgent humanitarian reasons or significant public benefit and were provided I-94s allowing them to be lawfully present in the United States through December 1, 2026. *Id.* Their daughter has serious medical needs. *Id.* VAM Members C and D's parole was terminated on April 18, 2025. *Id.* VAM Members C and D timely filed asylum applications, and have an upcoming hearing in immigration court on July 21, 2026. *Id.*

Sileiri, Olivia, Meryem, VAM Member A, VAM Member B, and VAM Members C and D fled their home countries due to violence and persecution and traveled through multiple countries to reach Mexico. Sileiri Decl. ¶¶ 4- 5, Meryem Decl. ¶¶ 5, 11-13, Olivia Decl. ¶¶ 6-7, 10-11, Velasquez Decl. ¶¶ 11-13. They downloaded the CBP One app and tried regularly—some daily—to procure an appointment from Mexico, waiting weeks to as many as nine months in Meryem's case. Sileiri Decl. ¶ 6, Meryem Decl. ¶ 6, Olivia Decl. ¶ 8, Velasquez Decl. ¶¶ 11-13. Several of them endured dangerous conditions in Mexico including being kidnapped, Velasquez Decl. ¶ 13, and hiding at night to avoid kidnapping and extortion, Meryem Decl. ¶ 5, Sileiri Decl. ¶ 6.

Once they were able to obtain a CBP One appointment, Plaintiffs traveled to their designated ports of entry ("POEs") and presented themselves for inspection at the U.S.-Mexico border. Sileiri Decl. ¶ 3, Meryem Decl. ¶ 3, Olivia Decl. ¶ 3, Velasquez Decl. ¶¶ 11-13. They provided biometrical information, including fingerprints and DNA samples, to CBP officials, *see* Sileiri Decl. ¶ 8, Meryem Decl. ¶ 8, Olivia Decl. ¶ 9, Velasquez Decl. ¶ 11, and answered questions, *see* Sileiri Decl. ¶ 8, Meryem Decl. ¶ 8, Velasquez Decl. ¶ 11. Following the CBP officials' assessment, Individual Plaintiffs and at least 18,500 VAM members were lawfully granted parole based on urgent humanitarian reasons or a significant public benefit, pursuant to 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5, and were issued a Form I-94 indicating they were lawfully present in the United States for the two-year term of their parole.[2] Sileiri Decl. ¶ 3, Meryem Decl. ¶ 3, Olivia Decl. ¶ 5, Velasquez Decl. ¶¶ 11-13 They were then eligible to obtain work authorization, allowing them to work legally in the United States for the duration of their parole. Sileiri Decl. ¶ 3, Meryem Decl. ¶ 3, Velasquez Decl. ¶¶ 11-13.

### B. Defendants terminated Plaintiffs' parole without explanation

In April 2025, the Trump Administration announced that it terminated all grants of parole to noncitizens who had entered the United States through appointments procured on the CBP One app. *See* Ali Bianco, *DHS Revokes Parole for Hundreds of Thousands Who Entered Via the CBP One App*, Politico, (Apr. 8, 2025), https://perma.cc/M7FE-7DQJ. Many noncitizen parolees received a mass email from a "no reply" government email address ("Termination Notice") that stated that their lawful parole status would terminate within seven days of receipt of the notice and urged them to depart from the United States "immediately." *See* Sileiri Decl. ¶ 16, Olivia Decl. ¶ 14, Velasquez Decl. ¶¶ 11, 13. The Termination Notice read:

---

[2] To make discretionary parole determinations, CBP officers considered a variety of factors, including but not limited to "the nature of the noncitizen's inadmissibility, any humanitarian or public interest considerations relevant at the time of inspection, any previous apprehensions, previous grants of discretion, and the noncitizen's intended purpose for seeking entry into the United States." *See* Examining CBP One: Functions, Features, Expansion, and Risks: Joint Hearing Before the Subcommittee on Border Secretary and Enforcement and the Subcommittee on Oversight, Investigations, and Accountability, 188th Cong. at 20 (Mar. 21, 2024), https://perma.cc/A8RD-5SHS (prepared statement of Adam Hunter, Deputy Assistant Secretary for Immigration Policy at the Department of Homeland Security).

**Notice of Termination of Parole**

It is time for you to leave the United States.

You are currently here because the Department of Homeland Security (DHS) paroled you into the United for a limited parole period. Pursuant to 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e), DHS is now exercising its discretion to terminate your parole. Unless it expires sooner, your parole will terminate 7 days from the date of this notice.

If you do not depart the United States *immediately* you will be subject to potential law enforcement actions that will result in your removal from the United States – unless you have otherwise obtained a lawful basis to remain here. Any benefits you receive in the United States in connection with your parole – such as work authorization – will also terminate. You will be subject to potential criminal prosecution, civil fines, and penalties, and any other lawful options available to the federal government.

DHS encourages you to leave immediately on your own. You can use the CBP Home mobile app on your phone to make arrangements for your departure. If you are departing the United States via land, you should report your departure once outside the United States via that same app. If you are having trouble reporting your departure via land, visit https://i94.cbp.dhs.gov/home for more information about voluntarily reporting your departure.

Again, DHS is terminating your parole. Do not attempt to remain in the United States – the federal government will find you. Please depart the United States immediately.

ECF No. 32-3, SDOE140. Many parolees did not receive this notice but instead learned of their parole termination only after they looked up their online Form I-94 upon seeing the mass parole terminations on the news or social media. Meryem Decl. ¶¶ 21-22 (describing that she regularly checked her I-94 status on the CBP website and, one day, saw that her parole was terminated). Individual Plaintiffs and VAM members subsequently learned that their work authorization had been revoked. Sileiri Decl. ¶ 16, Meryem Decl. ¶ 23, Velasquez Decl. ¶¶ 11-13.

Defendants do not explain their decision to terminate *en masse* the parole of all individuals who secured their appointments for inspection via the CBP One app. Defendants' administrative record consists primarily of DHS documents outlining policy changes and legal authorities governing parole, enforcement discretion, and border management. The administrative record includes two memoranda from Acting Secretary Benjamine C. Huffman that direct DHS components to revise or terminate parole programs inconsistent with new enforcement discretion guidance; multiple Federal Register notices establishing or modifying unrelated parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (2022-2023); executive orders (EO 14159 and EO 14165) and Federal Register rules

7

expanding expedited removal and border security policies (Jan. 2025); prior DHS and Border Patrol memoranda (2021-2023) on "Parole Plus Alternatives to Detention" and conditional parole procedures; and two 2025 DHS template notices that advise parolees that their parole has been terminated (April 11 and June 20, 2025). The record is 142 pages total.[3]

While Defendants' administrative record does not purport to explain or otherwise provide a basis for their decision to terminate *en masse* the parole of all individuals who secured their appointments for inspection via the CBP One app, the two memoranda from the Acting Secretary, SDOE001-02 & SDOE003-04, direct DHS subcomponents to "ensure that all future actions taken by DHS with regard to the exercise of parole authority are consistent with" the Acting Secretary's interpretation of 8 U.S.C. § 1182, SDOE004, and to "exercise enforcement discretion" in furtherance of that goal, SDOE001.

The first memorandum, entitled *Exercising Appropriate Discretion Under Parole Authority* ("January 20 memorandum") expresses that parole authority under 8 U.S.C. § 1182(d)(5) is meant to be narrow, discretionary, and exercised "only on a case-by-case basis" for urgent humanitarian reasons or significant public benefit. SDOE003-04. The January 20 memorandum provides that 8 U.S.C. § 1182(d)(5)(A) applies in "narrow circumstances and only on a case-by-case basis" and "does not authorize categorical parole programs," which, unlike the Federal Register notices establishing or modifying parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela, are not at issue here. *Id.* The memorandum declares that "many current DHS policies and practices governing parole [we]re inconsistent with [8 U.S.C. § 1182(d)(5)(A)]." SDOE004. To address that apparent inconsistency, the memorandum orders Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and CBP to review all parole-related policies and procedures, identify those that were not "strictly in accord" with 8 U.S.C. § 1182(d)(5)(A), and develop a plan to phase them out. *Id.*

---

[3] The certification of the administrative record, certified administrative record index, and administrative record documents that are cited in this memorandum are attached hereto at ECF No. 32-3 and referenced by their bates-stamp "SDOE."

The second memorandum, entitled *Guidance Regarding How to Exercise Enforcement Discretion* ("January 23 memorandum"), directs DHS subcomponents to limit the use of parole and to expand expedited removal. SDOE001-02. The January 23 memorandum directs DHS subcomponents to "[t]ake all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal" and to "[r]eview the alien's parole status to determine, in exercising your enforcement discretion, whether parole remains appropriate in light of any changed legal or factual circumstances" for noncitizens that were "granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum." SDOE002. The memorandum instructs that all "actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders. They shall also be taken in a manner that takes account of legitimate reliance interests." *Id.*

### C. Plaintiffs have suffered serious harm

Defendants' mass parole terminations have had devastating and far-reaching impacts on Plaintiffs. Individual Plaintiffs and VAM members relied on their parole status to enter the United States, seek more permanent immigration relief, apply for employment authorization, properly access employment, services, and resources for themselves and their families, and reside safely in their communities. As a result of Defendants' mass parole terminations, Individual Plaintiffs and VAM members live in constant fear of being detained and deported to countries where their lives would be at risk. When Plaintiffs found out about the termination of their lawfully granted parole and loss of work authorization, they were devastated. Sileiri Decl. ¶ 17, Meryem Decl. ¶ 24, Olivia Decl. ¶¶ 15-16, Velasquez Decl. ¶¶ 11-13. Sileiri has experienced anxiety attacks, had difficulty sleeping, and is in constant fear of being returned to Venezuela. Sileiri Decl. ¶¶ 18, 21. Meryem experienced fear and hopelessness and is afraid she and her daughter will be returned to Cuba or deported to another dangerous country. Meryem Decl. ¶¶ 24, 27. Olivia feels distraught that her parole was terminated even though she followed the process and is afraid she will be picked up by ICE. Olivia Decl. ¶¶ 15-16. Similarly, VAM Members A, B, C, and D experienced fear, terror, and panic at the loss of their parole. Velasquez Decl. ¶¶ 11-13.

Individual Plaintiffs and VAM members are now terrified of leaving their homes and putting themselves at risk for detention and deportation. Sileiri Decl. ¶¶ 20, 22, Meryem Decl. ¶ 27, Olivia Decl. ¶ 16, Velasquez Decl. ¶ 13. Sileiri doesn't answer her door, leaves the house only to go to work and to purchase necessities, and rushes home as quickly as possible. Sileiri Decl. ¶ 20. She has stopped going to church or participating in community activities like taking English classes. *Id.* ¶ 23. Meryem used to take her daughter for walks, to play in the park, and to go grocery shopping. Meryem Decl. ¶ 27. Now they leave only once a month to go grocery shopping. *Id.* Olivia stays inside as much as possible, leaving only to shop for groceries and items she needs for her baby. Olivia Decl. ¶ 16. VAM Members are similarly afraid. For example, VAM Members C and D leave the house only for their daughter's medical appointments, to get food, or when otherwise absolutely necessary. Velasquez Decl. ¶ 13.

And critically, Defendants' mass parole termination will prevent or delay Individual Plaintiffs and VAM members from obtaining more permanent immigration relief. As noted above, Sileiri, Olivia, and VAM Members A,B, C, and D have pending claims for asylum, and Meryem has a pending claim for adjustment under the Cuban Adjustment Act. The terminations of their parole will force Plaintiffs to return to the dangerous situations from which they fled or face removal to a third country to which they have no ties, thereby jeopardizing their ability to pursue claims for more permanent immigration relief.

**III. Procedural History**

On August 11, 2025, Individual Plaintiffs, on behalf of themselves and others similarly situated, and VAM, on behalf of its members, filed suit against Defendants. Plaintiffs challenge Defendants' decision to conduct an *en masse* parole termination and the parole terminations themselves as arbitrary, capricious, and contrary to law. On August 12, 2025, Individual Plaintiffs filed a motion to proceed pseudonymously, ECF No. 4, and a motion to certify class, ECF No. 5. The proposed class consists of all individuals who (i) scheduled their appointments for entry to the United States using the CBP One app; (ii) were paroled into the United States between May 16, 2023 and January 19, 2025; (iii) had their parole terminated in April 2025; and (iv) remain in the United States. Those

motions are fully briefed and remain pending.  On September 9, 2025, the parties filed a joint motion for a briefing schedule, which requested to proceed directly to summary judgment briefing.  ECF No. 16.  Plaintiffs asserted that they are experiencing and will continue to experience serious harm while their parole remains terminated, such that good cause existed to expedite the Court's resolution of this case.  *Id.*  The Court granted the parties' proposed schedule.  ECF No. 18.

## LEGAL STANDARD

"When administrative action is challenged under the APA summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Minuteman Health, Inc. v. United States Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 189-90 (D. Mass. 2018) (cleaned up).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  When a statute "delegates discretionary authority to an agency, the role of the reviewing court under the APA is . . . to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024).  "[T]he court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decision making within those boundaries."  *Id.* (cleaned up).  "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1511 (2025).

## ARGUMENT

Through this lawsuit, the Individual Plaintiffs, on behalf of themselves and the putative class, and VAM on behalf of its members, seek to hold unlawful, vacate and/or set aside under the APA Defendants' decision to conduct an *en masse* parole termination and the parole terminations

themselves.

## I.    Defendants' Decision to Terminate Parole *En Masse* Is Arbitrary, Capricious, and Contrary to Law

Defendants' decision to terminate parole *en masse* violates the APA because it is arbitrary, capricious, and contrary to law.  5 U.S.C. § 706(2)(A).  *First*, the *en masse* terminations are arbitrary and capricious because they lack any explanation, let alone an adequate explanation.  It follows that Defendants similarly failed to provide a "more detailed justification" to explain the departure from their previous position that parole was warranted in those precise cases, as is required where, as here, the agency's previous position engendered serious reliance interests.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).  *Second*, the *en masse* terminations violate the INA, which requires that any modifications to the conditions of parole be made on a case-by-case basis and only after a determination that the purpose of parole has been served, 8 U.S.C. § 1182(d)(5)(A).  Defendants instead *sub silentio* modified the terms of Plaintiffs' parole and terminated their parole *en masse*, all of which was done absent any determination that the purpose of parole had been met in any Plaintiff's case, let alone all of Plaintiffs' cases.  *Third*, the *en masse* terminations contravene DHS's own regulations, which require that, prior to an early termination of parole, an authorized official determine that neither humanitarian reasons nor public benefits warrant the continued presence of that person in the United States, 8 C.F.R. § 212.5(e)(2)(i).  But no authorized official (nor anyone else for that matter) even purported to make such a determination.  Defendants' decision to terminate parole *en masse* therefore is arbitrary, capricious, and contrary to law many times over.

### A.    Defendants' abject failure to explain their decision to terminate parole *en masse* is arbitrary and capricious

Defendants' wholesale failure to provide any explanation for their decision to terminate parole *en masse* violates the APA.  The APA requires an agency to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted); *see also Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*, 75 F.4th 248, 269 (1st Cir. 2023).  That requirement is satisfied when the agency's explanation is clear

enough that its "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974). "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

And while an agency "may alter its rules," it nevertheless must "offer a reasoned explanation for the change." *Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 351 (1st Cir. 2004). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515. Where, as here, the agency action represents a change in the agency's position that "engendered serious reliance interests," the APA imposes a heightened duty on the agency to provide a "more detailed justification" for the reversal. *Id.* at 515-16; *see, e.g.*, *Encino Motorcars, LLC*, 579 U.S. at 221-24 (agency's change in position was arbitrary and capricious where agency provided "almost no reasons at all" rather than providing the required "good reasons for the new policy").

Critically, courts are "ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com. v. New York*, 588 U.S. 752, 755 (2019). "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 785; *see also Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) ("It is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale.") (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).

Here, there was *no* contemporaneous explanation for Defendants' decision to terminate parole *en masse* for the hundreds of thousands of noncitizens who had used the CBP One app to secure their appointments for border inspection. Defendants simply began sending mass parole termination notices via email—from a "no reply" address and addressed to no one in particular—and later announced that "[f]ormal termination notices have been issued, and affected aliens are urged to voluntarily self-deport using the CBP Home app. Those who refuse will be found, removed, and

13

permanently barred from reentry." Ali Bianco, *DHS revokes parole for hundreds of thousands who entered via the CBP One App*, Politico (Apr. 8, 2025), https://perma.cc/M7FE-7DQJ; *see also* SDOE140. There was no explanation of the overarching decision or attempt to connect the decision to any evidence. The email told recipients that "DHS is now exercising its discretion to terminate your parole" and instructed them to "depart the United States immediately," but included no explanation. *See* SDOE140. Defendants' abject failure to explain their decision at the time it was made is itself sufficient to show that Defendants' decision to terminate parole *en masse* is arbitrary and capricious in violation of the APA. *See RFE/RL, Inc. v. Lake*, 772 F. Supp. 3d 79, 84 (D.D.C. 2025) (a "one line" communication "unsupported by any facts or reasoning, is not a 'satisfactory explanation' and offers no 'rational connection between the facts found and the choices made.'"); *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 857 (D. Md. 2025) ("template or boilerplate letter" was arbitrary and capricious because it "did not consider individual, or any, data or information"); *compare with Doe v. Noem*, -- F. 4th --, No. 25-1384, 2025 WL 2630395, *12 (1st Cir. Sept. 12, 2025) ("[H]ere the Secretary considered and addressed the reliance interests of CHNV parolees and their supporters.").

Nothing in the administrative record explains Defendants' decision to terminate parole *en masse*.[4] To the contrary, the January 23 memorandum directs DHS subcomponents to consider whether parole remains appropriate on a case-by-case basis and "in light of any changed legal or factual circumstances." *See* SDOE001. Moreover, that direction applies to noncitizens "granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum," *i.e.*, categorical parole programs, which are irrelevant here. *Id.* And courts "may not

---

[4] Indeed, the certified administrative record index is entitled "Certified Administrative Record Index: Benjamine C. Huffman Memo, 'Guidance Regarding How to Exercise Enforcement Discretion' (Jan. 23, 2025)" and therefore indicates that the provided administrative record relates to Defendants' decision to issue the January 23 memorandum, not Defendants' April 2025 decision to terminate parole *en masse*. *See* ECF No. 32-3, Certified Administrative Record Index. But the certification makes clear that Defendants *did* make a separate decision to terminate parole *en masse*: "[t]he Office of the Commissioner directed the Agency's decision in or around April 2025 to terminate parole grants issued by CBP." *Id.*, Certification of Administrative Record. As discussed *infra*, no document provided in the administrative record purports to explain that decision.

supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43.

Defendants' mass parole terminations are textbook arbitrary and capricious such that any explanation (if there were one) could not be "rational." *State Farm*, 463 U.S. at 42-43. Defendants' termination notices and the administrative record do not indicate that Defendants were even aware of whose parole they terminated: no document in the administrative record purports to identify whose parole Defendants terminated; nor did the termination notices sent via email identify their recipients, *see* SDOE140. Perplexingly, Defendants sent the termination notices to multiple U.S. citizens, directing them to leave the country immediately. *See* Michael Rosenfield, *DHS told her to leave the country. She's a citizen—and an immigration attorney*, NBC Boston (Apr. 13, 2025), https://perma.cc/F2LR-SV5L; Staff Reports, *2nd Mass. immigration attorney, also US citizen, told to leave country in DHS email*, NBC Boston (Apr. 15, 2025), https://perma.cc/X3HK-WNA4. And Defendants did not even notify every individual whose parole they terminated—some Plaintiffs, including Meryem Doe, learned that their parole was terminated only after they looked up their parole status on the CBP website. Meryem Decl. ¶¶ 21-22. The parole terminations were also purportedly effective within seven days of receipt of the notice (or immediately for those who did not receive the notice), but Defendants offered no reason to justify this short timeframe. Defendants' decision to terminate parole *en masse* for hundreds of thousands of individuals, whose term was set to expire within the next few months or up to two years, does not make any rational sense on its face.

Compounding the arbitrary and capricious violation, Defendants failed to provide a reasoned explanation—or any explanation at all—to "disregard[] facts and circumstances that underlay," *Fox*, 556 U.S. at 516, their previous decision to grant the same Plaintiffs parole because it would serve "urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A). "When an agency changes course," as Defendants did here by terminating parole that was granted as recently as four months prior, it must adequately explain its change in position and consider the "serious reliance interests" of stakeholders. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30, 33 (2020) (cleaned up) (explaining that the APA requires agencies "to assess whether there were reliance

15

interests, determine whether they were significant, and weigh any such interests against competing policy concerns"); *Fox*, 556 U.S. at 515 (holding that "[i]t would be arbitrary or capricious to ignore" serious reliance interests); *Encino Motorcars*, 579 U.S. at 222 (when an agency changes a policy, it must address the "serious reliance interests . . . engendered . . . [by] longstanding policies"). But Defendants did not explain their change in position. Nor did they consider the serious reliance interests of Plaintiffs, who relied on their parole status for a set time period to work lawfully and gainfully in the U.S., apply for asylum or other immigration relief, and properly access services and resources for their families. For example, Sileiri has a hearing in September 2026 on her pending claim for asylum based on her fear of persecution and violence in her home country of Venezuela. Sileiri Decl. ¶ 13. She will be unable to pursue her asylum claim if she is deported or leaves the country. She fears every day that she will lose her job and will not be able to help provide for her family in Venezuela and in the United States. *Id.* ¶ 18. Meryem has a pending claim for adjustment under the Cuban Adjustment Act, Meryem Decl. ¶ 4, and will be unable to pursue her claim if she is deported or leaves the country. The lease on the apartment where Meryem lives with her family does not expire until February 2026, and she will have to break the lease at significant financial cost if she leaves the country. *Id.* ¶ 15. Olivia has a pending claim for asylum with a court date on December 8, 2027, and like the others, she will be unable to pursue her asylum claim if she is deported or leaves the country. Olivia Decl. ¶ 14.

Defendants' complete failure to consider Plaintiffs' serious reliance interests is arbitrary and capricious. *See Regents of the Univ. of California*, 591 U.S. at 33; *see also S.A. v. Trump*, 363 F. Supp. 3d 1048, 1090 (N.D. Cal. 2018) (holding DHS's decision to mass rescind conditional parole approvals under the Central American Minors parole program arbitrary and capricious where DHS failed to consider "serious reliance interests"). That failure further indicates that Defendants "entirely failed to consider an important aspect of the problem" in the mass terminations of parole, namely, Plaintiffs' serious reliance interests and the devastating impacts from the sudden and unexplained terminations of parole. *State Farm*, 463 U.S. at 43. Even Defendants' own guidance in the January 23 memorandum requires DHS subcomponents to consider "legitimate reliance interests" before they terminate an individual's parole. SDOE001. Yet, Defendants ignored this directive and proceeded to terminate

16

parole without any consideration of reliance interests, or explanation of why they changed position on Plaintiffs' parole decisions.

### B. Defendants' decision to terminate parole *en masse* violates the INA

The INA authorizes the Secretary to "in h[er] discretion` parole into the United States temporarily under such conditions as [s]he may prescribe only on a case-by-case basis . . . any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The INA further provides that parole shall be terminated "when the purposes of [] parole . . . in the opinion of the Secretary of Homeland Security . . . have been served." 8 U.S.C. § 1182(d)(5)(A); *see, e.g.*, *Y-Z-L-H v. Bostock*, -- F. Supp. 3d --, No. 3:25-CV-965-SI, 2025 WL 1898025, at *6 (D. Or. July 9, 2025) ("This is a grant of discretionary authority, but it has a mandatory requirement—parole may be terminated or revoked only when in the Secretary's opinion the parole's purposes have been met."). Defendants' decision to terminate parole *en masse* violates the statutory text of the INA in at least two ways.

**1.** As noted above, the INA requires that the Secretary prescribe on a case-by-case basis the conditions of parole, which necessarily include any modifications to the initial conditions of parole. *See* 8 U.S.C. § 1182(d)(5)(A) ("The [Secretary] may . . . in h[er] discretion parole into the United States temporarily under *such conditions as [s]he may prescribe only on a case-by-case basis* . . . any alien applying for admission to the United States" (emphasis added)). But here, the Secretary disregarded this requirement by modifying the conditions of parole for Plaintiffs *en masse* (*i.e.*, not on a case-by-case basis). The Secretary identified no changes in any individual's circumstances to warrant termination of their parole; instead, the Secretary modified their conditions of parole such that Plaintiffs no longer met the Secretary's (altered) conditions and, as a result, their parole was terminated.

The First Circuit's recent decision in *Doe v. Noem* is not to the contrary. *Doe*, 2025 WL 2630395. In *Doe v. Noem*, the First Circuit considered the plaintiffs' likelihood of success in their challenge to DHS's Federal Register Notice, entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," which terminated the prior administration's parole programs under which nationals of Cuba, Haiti, Nicaragua, and Venezuela who met certain categorical criteria could seek discretionary individual grants of parole into the United States for up to two years (collectively

17

"CHNV parole programs"), and announced that it would terminate all existing grants of parole under the CHNV parole programs in 30 days. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611, 13,611 (Mar. 25, 2025). With respect to the announcement of early terminations of parole under the CHNV parole programs, the court concluded that plaintiffs did not meet their burden to demonstrate that DHS was required to undertake a case-by-case analysis for each termination. *Doe*, 2025 WL 2630395, *8. But critically, *Doe v. Noem* interpreted the statutory text of "the clause describing the Secretary's authority to terminate any grants of parole" and concluded that it "does not contain the same limiting language" as the clause describing "the Secretary's decision to grant parole," which required a case-by-case analysis. *Id.* The court, however, did not address modifications to the conditions of parole, which, as suggested by the plain text of the statute, require a case-by-case analysis. Moreover, *Doe v. Noem* involved a parole program established via a written federal policy for nationals of specific countries who met its categorical requirements based in part on the conditions in the designated countries, whereas Plaintiffs are of many nationalities and meet the INA's humanitarian and/or public benefit criteria due to variable conditions that necessitate case-by-case review.[5]

**2.** Defendants' actions also contravene the INA's requirement that the Secretary must determine that "the purposes of [] parole . . . have been served" in order to terminate an individual's parole. 8 U.S.C. § 1182(d)(5)(A). The Secretary did not reach that conclusion before she terminated parole *en masse*, nor is there a scintilla of evidence in the administrative record that would indicate that the purposes of parole in any individual noncitizen's case, let alone in all cases, have been served.

**C. Defendants' decision to terminate parole *en masse* violates DHS regulations**

Defendants' decision to terminate parole *en masse* is also arbitrary, capricious, and contrary to law because it violates DHS's own regulations, as set forth in 8 C.F.R. § 212.5. An agency is "bound

---

[5] The Secretary's decision to alter *en masse* the expiration dates of noncitizens' periods of parole is, by itself, "prescrib[ing]" revised "conditions" of each person's parole (*i.e.*, changing the duration of each grant), but not on a case-by-case basis. While the plaintiffs raised this as an alternative argument in *Doe v. Noem*, ECF No. 46 at 37, 1:25-cv-10495 (D. Mass.), the district court did not reach it, and the First Circuit did not address it.

18

by its own regulations," *Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up).  When the agency does not act in accordance with those regulations, it acts arbitrarily and capriciously.  *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018).

DHS regulations provide the conditions under which the DHS Secretary and her delegees may grant and terminate parole.  *See* 8 C.F.R. § 212.5(a).  As relevant here, the regulations provide that parole decisions be made "in accordance with" the terms of the above-described INA provision.  8 C.F.R. § 212.5(c).  Consistent with the INA, the regulations provide that, absent automatic termination, parole "shall be terminated upon written notice to the alien" if the "purpose for which parole was authorized" is "accomplish[ed]" or "when in the opinion of" the DHS Secretary or an authorized official "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States."  *Id.*  Defendants' decision to terminate parole *en masse* violates these DHS regulations in at least two ways.

**1.**  Defendants terminated Plaintiffs' parole before the expiration of the time for which parole was authorized *without* any determination that the purpose for which parole was authorized had been accomplished, or that humanitarian reasons or public benefit no longer warrants their continued parole, as required by 8 C.F.R. § 212.5(e)(2).  Defendants provided *no* contemporaneous justification for their decision, much less one that adheres to the regulatory requirements set forth in section 212.5.

**2.**  Even if Defendants could plausibly argue that they determined that "neither humanitarian reasons nor public benefits warrants the continued presence of the alien in the United States," that determination was not properly made via "termination upon written notice" by an official authorized pursuant to the exclusive list in section 212.5(a).  8 C.F.R. § 212.5(e)(2)(i).  *First*, not all impacted individuals received a written notice, *see* Meryem Decl. ¶¶ 21-22, but even for those that did, the written notices were deficient because they did not explain what changed with regard to humanitarian or public benefit reasons that warranted the parole terminations.  *Second*, the termination notices were not signed by an authorized official; instead, they were unsigned and emailed from a "no reply" email address.  *Compare with* 8 C.F.R. § 212.5(e)(2)(i) (authorizing parole termination when "*in the opinion of*

19

*one of the officials listed in paragraph (a) of this section*, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States") (emphasis added); *see also id.* § 212.5(a) (providing list of authorized officials).  Indeed, the certification of the administrative record makes clear that the "Office of the Commissioner," rather than any authorized official, "directed the Agency's decision in or around April 2025 to terminate parole grants issued by CBP."  ECF No. 32-3, Certified Administrative Record Index.

## II.  The Parole Terminations Themselves Are Arbitrary, Capricious, and Contrary to Law

The parole terminations as to each Plaintiff are distinct final agency actions.  For the same reasons discussed above *supra* Part I, the parole terminations themselves are arbitrary, capricious, and contrary to law.  The parole terminations themselves do not withstand scrutiny for an additional reason: beyond Defendants' failure to provide any explanation or basis for the decision to terminate parole *en masse*, Defendants were required but failed to provide information specific to individual noncitizens to justify their decision to terminate that individual's parole.

\* \* \*

For the reasons discussed above, the mass parole terminations are both contrary to the governing statute and regulation and a wholesale failure of reasoned decision-making.  The Court should therefore follow "the normal course and vacate" the mass parole terminations.  *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("When an agency's action is unlawful, 'vacatur is the normal remedy.'").

### CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated: October 16, 2025                          Respectfully,

*/s/  Allyson R. Scher*
Brian D. Netter (D.C. Bar No. 979362)*
Allyson R. Scher (D.C. Bar No. 1616379)*
Cortney Robinson (D.C. Bar No. 1656074)*
Democracy Forward Foundation

20

P.O. Box 34553
Washington, DC 20043
(202) 448-9090
bnetter@democracyforward.org
ascher@democracyforward.org
crhenderson@democracyforward.org

Melanie M. Chaput (MA Bar No. 643470)
Heather Arroyo (MA Bar No. 698460)
Iris Gomez (MA Bar No. 201000)
MASSACHUSETTS LAW REFORM INSTITUTE
40 Court Street, Suite 700
Boston, MA 02108
Telephone: 617.357.0700
Facsimile: 617.357.0777
mchaput@mlri.org
harroyo@mlri.org
igomez@mlri.org

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

21